UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X

MARY GRACE MAGTOLES, AIRA C. TAN,
ANA MYRENE ESPINOSA, and ANA MERVINE
ESPINOSA, individually and on behalf
of all others similarly situated,

                                    **MEMORANDUM & ORDER**

                 Plaintiffs,        21-CV-1850 (KAM) (PK)

       - against -


UNITED STAFFING REGISTRY, INC. d/b/a
UNITED HOME CARE and BENJAMIN H. SANTOS,

                 Defendants.

---------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

           Plaintiffs are citizens of the Republic of the Philippines who work as healthcare professionals in the New York area.  Plaintiffs bring this putative class action against Defendants United Staffing Registry, Inc. ("the company"), and its sole owner, president, and chief executive officer, Benjamin H. Santos (collectively "Defendants"), for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.*  The complaint also asserts individual claims for breach of contract, unjust enrichment, and fraud, and seeks declaratory and injunctive relief and damages as to specific aspects of Plaintiffs' employment contracts.

           Presently before the Court is Plaintiffs' motion for summary judgment.  (ECF No. 54.)  Plaintiffs request entry of

summary judgment: (1) declaring that the liquidated damages and non-compete clauses in their standard employment contracts are unenforceable under both the Trafficking Victims Protection Act, 18 U.S.C. § 1589 *et. seq.*, and under New York common law; (2) permanently enjoining Defendants from threatening or attempting to enforce either the liquidated damages provision or the non-compete clause; (3) finding both Defendants liable for breach of contract in amounts to be determined at trial or inquest, including piercing the corporate veil of corporate Defendant United Staffing Registry, Inc. to hold individual Defendant Santos personally liable; (4) finding both Defendants liable for violations of the TVPA in amounts to be determined at trial or inquest; and (5) awarding Plaintiffs reasonable attorneys' fees and the costs of this action as authorized by 18 U.S.C. § 1595(a). For the reasons set forth below, the Court GRANTS in part and DENIES in part Plaintiffs' motion for summary judgment.

<u>**BACKGROUND**</u>

The following facts are drawn from the parties' submissions in connection with this motion, including the parties' Local Civil Rule 56.1 Statements of Facts, opposing 56.1 Statements, and reply 56.1 Statements.[1] Upon consideration of a

---

[1] (*See* ECF Nos. 43-1, Plaintiffs' Rule 56.1 Statement ("Pls. 56.1"); 67, Defendants' Response to Plaintiffs' Rule 56.1 Statement ("Defs. Resp. 56.1"); 46, Plaintiffs' Reply Rule 56.1 Statement ("Pls. Reply 56.1"); 43-2, Declaration of John J.P. Howley ("Howley Decl.") and exhibits attached thereto; 45, Declaration of Felix Vinluan ("Vinluan Decl.") and exhibits attached thereto;

motion for summary judgment, the Court must construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

## I.  Factual Background

The Court finds the following undisputed facts from the parties' submissions, unless otherwise noted.

### A. The Defendants

Defendant Benjamin Santos is the sole owner, president, and chief executive officer ("CEO") of Defendant United Staffing Registry, Inc. ("United Staffing"), a staffing company in the business of recruiting foreign-trained nurses and other healthcare professionals, sponsoring them for lawful immigration status that will allow them to work in the United States, and employing them

---

46-1, Reply Declaration of John J.P. Howley ("Howley Reply Decl.") and exhibit attached thereto.

The Court notes that Defendants first submitted their Response to Plaintiffs' Rule 56.1 Statement at ECF No. 44.  That document contravened this Court's Chambers Practices III.B.4(c) which states: "A party's 56.1 Counter Statement to a 56.1 Statement must quote, verbatim, the 56.1 Statement, including all citations, and respond to the moving party's statements of fact immediately beneath each statement."  The Court ordered Defendants to re-submit an identical version of ECF No. 44 with an inclusion of Plaintiffs' corresponding paragraphs per III.B.4(c).  (01/24/2023 Docket Entry).  Defendants filed their revised Response (ECF No. 67) on January 25, 2023 in accordance with the Court's Order, which the Court cites in this Memorandum and Order.

The Court also incorporates certain documents submitted in connection to the motion to dismiss (ECF Nos. 27-31) and the motion to certify class (ECF No. 40) previously filed in this case, which the parties rely upon in connection with this motion for summary judgment but did not re-submit with the motion.

Finally, all pagination citations, except for citations to deposition transcripts, refer to the page number assigned by the Court's CM/ECF system.

in New York.  (Pls. 56.1 at ¶ 9; Defs. Resp. 56.1 at ¶ 9; *see also* ECF No. 45-1 ("United Staffing Dep.") at 17.)   United Staffing assigns nurses to work at nursing homes and medical clinics owned and operated by its clients.  (Pls. 56.1 at ¶ 7; Defs. Resp. 56.1 at ¶ 7.)  Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than 20 years.  (Pls. 56.1 at ¶ 10; Defs. Resp. 56.1 at ¶ 10.)  Most of the nurses employed by United Staffing are from the Philippines. (Pls. 56.1 at ¶ 6; Defs. Resp. 56.1 at ¶ 6.)

United Staffing requires registered nurses ("RNs") that it sponsors to sign an Employment Agreement, although the timing may depend on whether the nurse was recruited from outside the United States or from within the United States.  (ECF No. 45-5 ("Pascual Decl.") at ¶ 6.)  Before foreign recruits are sponsored through the immigration process, United Staffing requires them to sign a three-year employment agreement with the company.  (Pls. 56.1 at ¶ 11; Defs. Resp. 56.1 at ¶ 11; *see also* ECF No. 45-4 ("Santos Decl.") at ¶¶ 6-7 ("Those we recruit from abroad are required, as a matter of company practice, to execute an Employment Agreement, which they would present to the U.S. Embassy during their consular interview."); Pascual Decl. at ¶¶ 6-7 ("United Staffing generally requires [non-U.S. citizens and non-lawful permanent residents RNs] whom we recruit and sponsor through the immigration process to sign a three-year Employment Agreement";

4

"United Staffing requires foreign-trained registered nurses recruited from outside the United States to sign our Employment Agreement before they are sponsored through the Form I-140 immigrant worker petition process.")).[2]

### B. The Nurse Plaintiffs and Their Employment Contracts

In 2018 and 2019, Plaintiffs Mary Grace Magtoles, Aira C. Tan, and Ana Myrene Espinosa (collectively, the "Nurse Plaintiffs") each signed United Staffing's "Standard Contract" to work for the company as an RN. (Pls. 56.1 at ¶ 13; Defs. Resp. 56.1 at ¶ 13; *see, e.g.,* ECF Nos. 28-2 ("Magtoles Contract"), 28-3 ("Tan Contract"), 28-4 ("Ana Myrene Espinosa Contract").)[3] Four provisions of the contracts are relevant to the instant motion.

---

[2] Defendants "dispute" Plaintiffs' assertion that "United Staffing required that foreign nurses sign a contract before it would file an immigration petition to sponsor them for permanent residence status or a 'green card,'" (Pls. 56.1 at ¶ 11), arguing that "United Staffing does not have any uniform policy when to require its RN-beneficiaries to sign an Employment Agreement." (Defs. Resp. 56.1 at ¶ 11.) The Court has reviewed the Santos Declaration and Pascual Declaration cited by Defendants, and concludes that Defendants' asserted dispute as to the material fact regarding Defendants' required contract is not genuine. The portions of both Declarations that Defendants cite clearly state, *inter alia*: "Those *we recruit from abroad* are required, as a matter of company practice, to execute an Employment Agreement, which they would present to the U.S. Embassy during their consular interview" (Santos Decl. ¶ 6) (emphasis added), and "United Staffing requires foreign-trained registered nurses recruited from outside the United States to sign our Employment Agreement before they are sponsored through the Form I-140 immigrant worker petition process." (Pascual Decl. ¶ 7.) "Under Rule 56, it is the court's responsibility to determine whether the opposing party's response to the assertion of a material fact presents a dispute that is genuine." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 312 (2d Cir. 2008).

[3] Defendants' Responsive 56.1 Statements frequently respond: "Undisputed, to the extent that the 'standard contract' referred to is the 'second version' of the employment contract." To the extent such Defendant Responses are attempting to cabin "undisputed" factual assertions as only applying to a "second version," the Court rejects any such attempt. On May 25, 2022, this Court certified "a class of all Filipino nurses who were employed by Defendants at any time since April 5, 2011 pursuant to an employment contract containing a liquidated damages

*First*, United Staffing's standard contract requires nurses to work a minimum number of hours during the three-year contract period. (*See, e.g.*, Magtoles Contract at 3; ECF No. 40-40, Ex. O at 3; ECF No. 40-45, Ex. T at 3.)  Most of United Staffing's foreign recruits — including the Nurse Plaintiffs and more than fifty others — signed a contract requiring 6,000 hours of work over the three-year period.[4]  (*See, e.g.*, Magtoles Contract; Pascual Decl. ¶ 22.)  If a nurse leaves United Staffing's employ before working the specified number of hours, the contract requires the nurse to pay $15 in "liquidated damages" for each hour that the nurse did not complete.[5]  (*See, e.g.*, Magtoles

---

provision, non-compete clause, immigration notification provision, and a prevailing wage requirement." *See Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM) (PK), 2022 WL 1667005, at *11 (E.D.N.Y. May 25, 2022). Therefore, when appropriate, the Court treats the "standard contract" in parties' 56.1 Statements as the employment agreement with the four provisions at issue, as previously certified. *See Magtoles*, 2022 WL 1667005, at *7 ("[T]he court concludes that the minor variations in the minimum number of hours do not materially affect the TVPA claims or the claims for declaratory and injunctive relief.").

[4] Thirteen nurses signed an employment contract requiring the completion of 5,100 hours over the three-year period, rather than 6,000 hours. (Pascual Decl. ¶ 21; *see* ECF No. 40-40, Ex. O at 3.)  Similarly, one nurse signed an employment contract requiring the completion of 5,616 hours over the three-year period. (Pascual Decl. ¶ 23; *see* ECF No. 40-45, Ex. T at 3.)

[5] Defendants repeatedly dispute Plaintiff's factual statements, such as Pls. 56.1 Statement ¶ 26, without citing to supporting admissible evidence, including by stating: "OBJECTED TO. This is not a statement of fact." (*See, e.g.*, Defs. Resp. 56.1 at ¶¶ 24-27.)  Defendants have not stated nor cited to any grounds for "objecting" to the factual assertion: "If a nurse stopped working before completing 6,000 hours of work, the 'liquidated damages' clause provided that she owed United Staffing $15 'for each hour or part of an hour performed of the [6,000-hour] requirement.'"  (*See* Pls. 56.1 at ¶ 24; Defs. Resp. 56.1 at ¶ 24.)

It is unclear if Defendants are objecting to whether the plain language of the liquidated damages provision states that the nurse "agrees and binds her/himself to pay the Employer Fifteen Dollars ($15.00) for each hour or part of an hour not performed of the requirement of Six Thousand (6,000) Hours of work as a

Contract at 3; ECF No. 40-40, Ex. O at 3; ECF No. 40-45, Ex. T at 3.)   For example, if a nurse signed a contract requiring 6,000 hours of work and then left United Staffing after completing 2,000 hours of work over the course of one year, the nurse would owe $60,000 in "liquidated damages" for the 4,000 remaining hours.[6]

*Second*, the contracts include a three-year, nationwide non-compete clause.   (Pls. 56.1 at ¶ 37; Defs. Resp. 56.1 at ¶ 37; *see, e.g.,* Magtoles Contract at 3.)   If a nurse leaves United Staffing before completing the minimum number of hours over the course of three years, the nurse cannot:

> 1.   In any manner whatsoever, directly or indirectly, work as a nurse, practice nursing, work as a physician's assistant, or otherwise practice the art of/science of nursing; or

---

reasonable estimate of the damages suffered by the Employer."   (*See, e.g.,* Magtoles Contract at 3.)   An identical provision is in the contracts requiring 5,100 hours, (Ex. O at 3), and requiring 5,616 hours, (Ex. T).

In any event, because Defendants fail to submit admissible evidence to support their objections, Plaintiffs' factual statements that are supported by admissible evidence are considered undisputed.   *See* Fed. R. Civ. P. 56(e)(2); *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (collecting cases) (holding that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration, citation, and internal quotation marks omitted)); *see also United States v. Gentges*, 531 F. Supp. 3d 731, 735 n.1 (S.D.N.Y. 2021) ("Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed.").

[6] As discussed *supra* note 5, Defendants have not stated nor cited to any grounds for "objecting" to Plaintiffs' factual assertion that a nurse who was to work 6,000 hours would owe United Staffing for 4,000 remaining hours if the nurse left United Staffing after completing 2,000 hours, based on simple math and the plain language of the contract: the nurse "binds her/himself to pay the Employer Fifteen Dollars ($15.00) for each hour or part of an hour not performed of the requirement of Six Thousand (6,000) Hours of work as a reasonable estimate of the damages suffered by the Employer."   (*See, e.g.,* Magtoles Contract at 3). An identical provision is in the contract requiring 5,100 hours, (Ex. O at 3), and requiring 5,616 hours, (Ex. T).

> 2. Directly or indirectly operate, own, lease (as landlord or tenant), engage or participate in as an owner, partner, employee, joint venturer, shareholder, director, assignor, seller, transferor, or as sales or marketing agent or otherwise, in, for or in connection with any business which competes with [United Staffing] within the United States for a period of THREE (3) YEARS after the EMPLOYEE severs his/her relationship with [United Staffing].

(*See, e.g.,* Magtoles Contract at 3.)

*Third*, the contracts provide that United Staffing will pay the Nurse Plaintiffs "a salary or wage that complies with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health care facility" where the nurse works. (*See, e.g.,* Magtoles Contract at 4; ECF No. 40-40, Ex. O at 4; ECF No. 40-45, Ex. T at 4.)

*Fourth*, the contracts provide that, if the nurse breaches the contract, United Staffing "will report" a change in employment status to "appropriate government authorities, including but not limited to the United States Citizenship and Immigration Service (USCIS) and the Immigration and Customs enforcement (ICE)." (*See, e.g.,* Magtoles Contract at 4.) The contracts also state that "such report may lead to the termination of the Permanent Resident Card (Green Card) and deportation of EMPLOYEE from the United States." (*See, e.g.,* Magtoles Contract at 4; ECF No. 40-40, Ex. O at 11; ECF No. 40-45, Ex. T at 4.)

### C. Plaintiff Ana Mervine Espinosa

Plaintiff Ana Mervine Espinosa (a/k/a "Bhyng Espinosa"[7]) is a licensed physical therapy aide and a citizen of the Republic of the Philippines. (Pls. 56.1 at ¶ 4; Defs. Resp. 56.1 at ¶ 4.)

## II.   Procedural History

Plaintiffs commenced this putative class action on April 6, 2021, bringing claims for violations of the TVPA, conspiracy to violate the TVPA, and attempting to violate the TVPA. (ECF No. 1 ("Compl.") ¶¶ 93-120.) The Nurse Plaintiffs also assert claims for breach of contract and seek declaratory judgment and injunctive relief, and Plaintiff Bhyng Espinosa brings claims for unjust enrichment and fraud. (*Id.* ¶¶ 121-47.)

On June 21, 2021, Defendants filed a letter requesting a pre-motion conference for their motion to dismiss the Complaint for failure to state a claim. (ECF No. 15.) After considering the parties' submissions, this Court issued a Memorandum & Order on December 30, 2021, granting in part and denying in large part Defendants' motion to dismiss. *Magtoles v. United Staffing Registry*, No. 21-CV-1850 (KAM)(PK), 2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021). Based on the liquidated damages provision, non-compete clause, and the immigration notification provision in United

---

[7] Two of the plaintiffs in this action, Ana Myrene Espinosa and Ana Mervine Espinosa, have notably similar names. In this Memorandum and Order, the Court refers to Ms. Ana Myrene Espinosa by her full name or as "Ms. Espinosa," and refers to Ms. Ana Mervine Espinosa as "Ms. Bhyng Espinosa," as stated in Plaintiffs' Rule 56.1 Statement ¶ 4.

Staffing's standard contract, the court concluded that the Nurse Plaintiffs stated plausible claims for violations of the TVPA, breach of contract, and grounds for declaratory judgment. *Id.* at *3-11. Although the Court concluded that Plaintiff Bhyng Espinosa could not assert claims under Section 1589 of the TVPA — because the Complaint failed to allege that she ever started work for United Staffing — the Court found that Ms. Bhyng Espinosa stated plausible claims for trafficking, conspiracy, and attempt under the TVPA, as well as for fraud and unjust enrichment under New York law. *Id.* at *10, *12. On February 8, 2022, Magistrate Judge Kuo issued an order certifying the close of all discovery. (2/8/22 Docket Order.) On May 25, 2022, this Court granted the Nurse Plaintiffs' motion for class certification and approved the notices to the putative class. *Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM)(PK), 2022 WL 1667005 (E.D.N.Y. May 25, 2022).

Finally, on August 30, 2022, less than a week before the opt-out deadline, Defendants sent an email — without seeking leave from this Court — to United Staffing employees, including members of the certified class in this action, encouraging them to opt out of the class. (ECF No. 57-2 ("8/30/22 Email").) On September 2, 2022, class counsel moved by order to show cause, pursuant to Federal Rule of Civil Procedure 23(d), for an order: (1) prohibiting Defendants and their attorneys, employees, agents, and

10

representatives from communicating with class members regarding
this action and the claims asserted without prior court approval;
(2) directing Defendants to provide class counsel with the names
and email addresses of all individuals who received Defendants'
August 30, 2022 email; and (3) authorizing class counsel to send
a curative notice to class members.  (ECF No. 57-4 at 1.)   The
Court held an Order to Show Cause Hearing on September 6, 2022.
In a September 6, 2022 Memorandum & Order granting class counsel's
motion, the Court found:

> As the employer of class members, Defendants
> sent an email warning class members that
> "United Staffing filed counterclaims against
> the nurses for preterminating their
> contracts." (8/30/22 Email at 1.) Viewed in
> context, this statement conveys an implicit
> threat, by the Defendants to their employee
> class members, that they too will be sued if
> they choose to remain in the class. This
> statement is also misleading because it
> suggests that nurses will face liability for
> "preterminating their contracts" (*id*.),
> regardless of whether those contracts (as
> Plaintiffs contend) are unenforceable.
>
> . . .
>
> Most notably, Defendants' email suggests that
> class members opt out with the following
> response: "I do not understand how your
> clients are claiming United Staffing forced
> them to work, when all of us voluntarily
> signed and we all understood the terms of our
> employment contract. I guess your clients just
> would like to get out of their 3-year
> contracts." (8/30/22 Email at 2.) Defendants'
> suggested responses also contain several other
> one-sided statements that parrot Defendants'
> defenses in this action and encourage class

> members to opt out, including: "I was not forced to work by United Staffing," "I signed my contract voluntarily," "The contract was clear," and "I was paid correctly." (*Id.*)

(ECF No. 61 at 10-11.)

This Court held that Defendants' unauthorized email was "misleading, coercive, and otherwise interfered with the proper administration of this class action." (*Id.* at 8.)

Plaintiffs now move for summary judgment as to: Defendants' liability under the TVPA and on the breach of contract claim; a declaration that the "liquidated damages" and "non-compete" clauses of the standard contract are invalid and unenforceable; and an injunction against the actual or threatened enforcement of those clauses. Plaintiffs also seek summary judgment in favor of Plaintiff Bhyng Espinosa on her claims for fraud and unjust enrichment, on the grounds that she paid Defendants $7,532.00 in connection with obtaining a labor certification, in violation of 20 C.F.R. § 656.12. (ECF No. 54-1 ("Pls. Mem.") at 10.)

## LEGAL STANDARD

Summary judgment shall be granted to a movant who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing

law.'"  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98,
104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 248 (1986)).  No genuine issue of material fact exists
"unless there is sufficient evidence favoring the nonmoving party
for a jury to return a verdict for that party."  *Anderson*, 477
U.S. at 249.  "If the evidence is merely colorable, or is not
significantly probative, summary judgment may be granted."  *Id.* at
249-50 (citations omitted).

When bringing a motion for summary judgment, the movant
carries the burden of demonstrating the absence of any disputed
issues of material fact and entitlement to judgment as a matter of
law.  *Rojas*, 660 F.3d at 104.  In deciding a summary judgment
motion, the court must resolve all ambiguities and draw all
reasonable inferences against the moving party.  *Flanigan v. Gen.
Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec.
Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).
A moving party may indicate the absence of a factual dispute by
"showing . . . that an adverse party cannot produce admissible
evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  Once
the moving party has met its burden, the non-moving party "must
come forward with admissible evidence sufficient to raise a genuine
issue of fact for trial in order to avoid summary judgment."
*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)
(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Finally, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

## DISCUSSION

### I.   Enforceability of the Liquidated Damages Provision

Plaintiffs request a declaratory judgment finding the liquidated damages provision of the contracts unenforceable.  They also request that Defendants be enjoined from attempting or threatening to enforce the provision.

### A. Legal Standard

Whether a liquidated damages provision is enforceable "is a question of law, giving due consideration to the nature of the contract and the circumstances."  *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC*, 609 F. App'x 669, 672 (2d Cir. 2015) (summary order) (internal quotation marks omitted). Such a provision is, in effect, an estimate "made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977).  A liquidated damages provision will not be enforced if it is contrary to public policy, "and public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority."  *Id.*

14

Accordingly, "[a] provision that does not serve the purpose of reasonably measuring the anticipated harm, but is instead punitive in nature, serving as a mere 'added spur to performance,' will not be enforced." *Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) (quoting *Priebe & Sons v. United States*, 332 U.S. 407, 413 (1947)).

To that end, "New York courts will construe a purported liquidated damages provision strictly." *Agerbrink*, 196 F. Supp. 3d at 417.  Courts will uphold and enforce liquidated damages provisions where (1) actual damages may be difficult to determine *and* (2) the damages amount awarded pursuant to the clause is not clearly disproportionate to the possible loss.  *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* 369 F.3d 34, 70-71 (2d Cir. 2004).  If the liquidated damages provision "does not satisfy one or both of these factors then it is considered an impermissible penalty and will not be enforced by the courts." *Union Cap. LLC v. Vape Holdings Inc.*, No. 16-CV-1343 (RJS), 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017).

Though the party challenging the liquidated damages provision bears the burden of demonstrating unenforceability, in doubtful cases, courts tend "to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages." *See Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169-70 (S.D.N.Y. 1990) (citation omitted); *see also*

*Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2003) ("[A]ny doubt with respect to whether the relevant provision is an unenforceable penalty or a permissible liquidated damages clause should be resolved in favor of a construction which holds that the provision is a penalty.").

Finally, in determining whether one side is exacting an unconscionable penalty, courts should also consider factors such as the sophistication of the parties, whether they were represented by counsel, and whether the contract was negotiated at arm's length. *See Rattigan,* 739 F. Supp. at 172 (internal quotation marks omitted); *Union Cap. LLC*, 2017 WL 1406278, at *7.

### B. Damages Disproportionate to Potential Loss

Here, Section 3(b) of the liquidated damages provision provides that "[i]n the event of a breach," a nurse must pay United Staffing $15 for "each hour or part of an hour not performed" of the required 6,000 hours in the contract. (*See, e.g.*, Magtoles Contract at 3.)  Section 3(a), in turn, states in relevant part ". . . that the EMPLOYEE breaches the contract by severing its relationship with the EMPLOYER before completion of the term of THREE (3) YEARS[.]"  (*Id.*)

Under these liquidated damages provisions, then, if a nurse pre-terminated his or her contract with United Staffing prior to completing any of the 6,000 hours, the nurse would owe a total of $90,000 — $15 for each hour.  As discussed *supra* note 6,

16

Defendants inexplicably "object" to this simple arithmetic based on the contract provisions' plain language, stating it is somehow "not a statement of fact." (Defs. Resp. 56.1 at ¶ 25; Pls. 56.1 at ¶ 25; *see also supra*, notes 5, 6.) The Court finds that this factual calculation, based on Defendants' own contract term, is undisputed.

In *Paguirigan v. Prompt Nursing Employment Agency, LLC*, the employment contracts between the class of Filipino nurses and the employment agency included a liquidated damages provision stating that the employees would pay the "Employer and/or its designee/assignee" $25,000 in the event that the nurses pre-terminated or otherwise breached the employment contract. *See* No. 17-CV-1302 (NG), 2019 WL 4647648, at *2, *8 (E.D.N.Y. Sept. 24, 2019), *aff'd in part, appeal dismissed in part,* 827 F. App'x 116 (2d Cir. 2020) (summary order). Judge Gershon found that the $25,000 was disproportionate to the contemplated injury, and was an unenforceable penalty, because "[c]onsidering that plaintiff's payroll records indicate that she typically made less than $700.00 per week after taxes, it would have taken her almost nine months to pay off the liquidated damages amount, assuming she had no other expenditures such as food or housing." *Id*. at 8.

Here, too, the liquidated damages provision in Plaintiffs' contracts are unenforceable penalties because the damages awarded pursuant to the liquidated damages clause are

patently disproportionate to the potential loss.   Indeed, the potential liquidated damages that a nurse could be liable for, $90,000, is significantly larger than the amount in *Paguirigan*. Even if a nurse were to pre-terminate her employment agreement with United Staffing after one year and completion of 2,000 hours — the minimum number of hours required annually under Section 1(c) of the contract (*see*, *e.g.,* Magtoles Contract at 3) — the nurse would still owe $60,000 to United Staffing for the remaining 4,000 hours.   Similarly, if a nurse were to cease working for United Staffing after two years and completion of 4,000 hours, the nurse would still owe $30,000 to United Staffing for the remaining 2,000 hours.

Here, Plaintiff Magtoles' payroll records indicate that in a week where she worked 40.00 hours at her hourly rate of $31.00, her net pay was $924.36 per week after taxes.   (ECF No. 43-17 ("Magtoles Payroll Records") at 19.)   It would have taken Magtoles approximately 97 weeks — almost *two years* — to pay off a liquidated damages amount of $90,000 had she quit United Staffing's employ without completing any hours, provided she put every dollar she earned towards paying off the amount and provided she "had no other expenditures such as food or housing," or any other living expense — an impossibility. *See Paguirigan,* 2019 WL 4647648, at *8.   This nearly two-year period of time necessary to pay

liquidated damages would be more than double the time (nine months) that constituted disproportionality in *Paguirigan*.

Moreover, *Paguirigan* found that the nine months it would have taken the plaintiff to pay off the $25,000 liquidated damages further supported "the conclusion that this provision is *intended to operate as a means to compel performance*, ensuring that plaintiff and other nurses did not resign prior to the end of their contract terms." *Id*. (internal quotation marks and citation omitted) (emphasis added); *see also Rattigan*, 739 F. Supp. at 169 ("If [a liquidated damages clause] is intended to operate as a means to compel performance, it will be deemed a penalty and will not be enforced." (citing *Brecher v. Laikin*, 430 F. Supp. 103, 106 (S.D.N.Y. 1977)). Accordingly, the Court follows the reasoning of *Paguirigan* to reach the same conclusion here: the liquidated damages provision is an unenforceable penalty.

Defendants argue that because the liquidated damages provision amount could "diminish[] over time, as the employee continues to perform under the agreement," this is "another factor indicating that the amount of actual damages Defendants anticipated resulting from a termination of the agreements prior to their execution was reasonably proportionate to the probable loss from the breach." (ECF No. 55 ("Defs. Mem.") at 23.) This argument is unavailing. The liquidated damages provision in *Paguirigan* also provided for a diminishing of liquidated damages

to $16,666.67 or $8,333.34 if the plaintiff pre-terminated or breached the contract in her second or third year, respectively. *Paguirigan,* 2019 WL 4647648, at *2.  As in *Paguirigan*, the "diminishing nature" of the liquidated damages amount does not impact the finding of disproportionate damages here.

Defendants also argue that unlike in *Paguirigan*, the standard contracts here do not contain (1) a confession of judgment that Defendants could file in court "should a plaintiff or recruited nurse [terminate] his or her contract early," or (2) language that the provision was intended "to secure Employee's performance of the Employment Term."  (Defs. Mem. at 24); *see Paguirigan,* 2019 WL 4647648, at *7.  Defendants then assert, in a conclusory fashion, that "[t]hus, the liquidated damages provision in United Staffing's contracts is not a penalty."  (Defs. Mem. at 24.)

Defendants mention these distinctions without any accompanying legal authority or arguments as to their legal relevance.  Defendants notably fail to recognize that Judge Gershon noted both points only after stating that "it is immaterial that the parties may describe the provision as a penalty." *Paguirigan,* 2019 WL 4647648, at *7.  The immateriality of a party's characterization of a liquidated damages provision is a well-established principle of assessing the enforceability of liquidated damages clauses*. See, e.g., Truck Rent-A-Ctr., Inc. v.*

20

*Puritan Farms 2nd, Inc.,* 361 N.E.2d 1015, 1018 (N.Y. 1977) ("In interpreting a provision fixing damages, it is not material whether the parties themselves have chosen to call the provision one for 'liquidated damages' . . . or have styled it as a penalty.") Neither a confession of judgment nor language that the purpose of a liquidated damages provision is "to secure Employee's performance of the Employment Term" ultimately speak to the crux of the analysis, specifically, whether the liquidated damages provision is plainly disproportionate to the contemplated injury or whether actual damages may be difficult to determine. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* 369 F.3d 34, 70 (2d Cir. 2004). Defendants fail to argue or cite contrary material facts or legal authority, and thus fail to present a triable issue of material fact as to the provision's disproportionality to potential loss. The Court therefore finds that the liquidated damages provision is an unenforceable penalty based on disproportionality.

### C. Difficulty of Ascertaining Damages

Because the Court has found that the liquidated damages amount is plainly disproportionate to the contemplated injury, the liquidated damages provision is an unenforceable penalty. The Court, however, also finds that the liquidated damages provision is separately unenforceable because actual damages upon a nurse's pre-termination of or breach of the contract would not have been

difficult to ascertain when the parties entered into the standard contract.

First, Defendants argue that "the portion of the costs incurred by United Staffing recruitment team in recruiting a particular RN would be unknown at the time the RN executed the agreement, because the total number of RNs that would be successfully recruited on any given recruitment trip to the Philippines would be unknown at the time." (Defs. Mem. at 21.) In affirming the district court's holding that the liquidated damages provision in *Paguirigan* was an unenforceable penalty, the Second Circuit rejected the defendants' argument that the liquidated damages provision was necessary to account for recruiting costs:

> [B]y their very nature, these costs had already been incurred by the time the parties signed the contract — after all, Defendants no longer had to expend funds recruiting [plaintiff] once she had signed on the dotted line. As a result, it would be eminently reasonable to expect that [defendant] could have reviewed its expenses (*averaging them to provide a per-nurse cost if necessary*) so as to arrive at a figure for the cost they incurred to recruit [plaintiff].

*Paguirigan v. Prompt Nursing Emp. Agency, LLC*, 827 Fed. App'x 116, 121 (2d Cir. 2020) (summary order) (emphasis added).

This Court arrives at the same conclusion here. By the time a nurse and United Staffing were entering into the standard contract — in other words, the time at which liquidated damages

would be estimated — recruiting costs would already have been incurred by United Staffing, and could be averaged to ascertain a "per-nurse" cost if necessary, as the Second Circuit has noted. Therefore, recruiting costs are not difficult to ascertain. Further, Defendants concede that reimbursements for "immigration sponsorship costs, training and living orientation costs . . . would have been easily ascertained, considering United Staffing has indeed been in the business for about twenty years now." (Defs. Mem. at 22.)

Defendants also argue that "the costs of replacing a recruited RN that terminated his or her employment prematurely also could not be known at the time United Staffing entered into a contract with the nurse," and, relatedly, that "United Staffing could not know whether or when a nurse would leave his or her employment when hiring the nurse, which would render an amortization of the recruitment costs impossible at the time the contract was entered into." (Defs. Mem. at 21.) It is undisputed, however, that: (1) Most of the nurses employed by United Staffing are from the Philippines, from which Defendants have recruited nurses for years; (2) United Staffing has assigned nurses to work at twenty client facilities in New York City and on Long Island; and (3) Defendants Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than twenty years. (Pls. 56.1 at ¶¶ 6, 8, 10; Defs. Resp. 56.1 at

23

¶¶ 6, 8, 10.)  Based on the undisputed facts before the Court and the unambiguous liquidated damages formula in the contracts, the Court respectfully rejects Defendants' argument that they could not reasonably ascertain the costs of replacing a nurse with their over two decades of experience in recruiting, employing, and assigning nurses, especially because multiple nurses have previously left Defendants' employ.  (*See* United Staffing Dep. at 65:02-65:22 (discussing nurses terminating their contracts with United Staffing); at 26:24-27:03 (discussing United Staffing maintaining a nurse's file for at least "six years" after the nurse left United Staffing's employ).)  Therefore, far from such costs being "incapable or difficult of precise estimation," the sophistication and experience of United Staffing show otherwise.

Defendants attempt to distinguish the standard contract here with that in *Paguirigan*, arguing that the *Paguirigan* contracts list numerous costs encompassed in the liquidated damages amount: "recruiting the employee," "sponsoring the Employee for an Immigrant Visa," "training the Employee in practice and procedures," and "orienting the Employee to living in the New York area" (Defs. Mem. at 21-22); *see also Paguirigan*, 2019 WL 4647648, at *2, whereas here, Defendants argue that the damages "envisioned in United Staffing's contracts also include, in addition, estimates for lost profit or lost income."  (Defs. Mem. at 22.)

To support their argument that damages are difficult to ascertain, Defendants point to Human Resources Manager Ferdinand Pascual's "supplemental affidavit," filed months after Defendants' Responsive 56.1 Statement (ECF No. 44) was submitted.  As an initial matter, this "supplemental affidavit" contravenes this Court's Chambers Practices III.B.4(i), which states: "Supplements to a 56.1 statement are not permitted absent leave of the Court and a showing of good cause." *See CIT Bank, N.A. v. Donnatin,* No. 17-CV-02167 (ADS), 2020 WL 248996, at *2 (E.D.N.Y. Jan. 16, 2020) ("The Court has broad discretion to determine whether to overlook a party's failure to comply with its individual rules." (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001))) (cleaned up); *cf. Perez v. U.S. Immigr. & Customs Enf't,* No. 19-CV-3154 (PGG), 2020 WL 4557387, at *3 (S.D.N.Y. Aug. 6, 2020), *report and recommendation adopted,* No. 19-CV-3154 (PGG), 2020 WL 5362356 (S.D.N.Y. Sept. 8, 2020) ("A court may enforce its rules and orders by striking noncompliant portions of a party's brief.") (collecting cases).

Here, Defendants failed to request leave of the Court — let alone show good cause — prior to submitting Pascual's "supplemental affidavit."  Defendants failed to request leave of the Court at any point after filing their Responsive 56.1 Statement and exhibits on May 10, 2022, nor in the *three full months* prior to the motion being fully submitted on August 25, 2022.  Belated

supplements to the record deprive a party of the opportunity to appropriately incorporate, respond to, or cite to any such "evidence" in their 56.1 Statements.[8]

Moreover, even if the "supplemental affidavit" did not violate this Court's motion practices, the portions to which Defendants cite in support of their lost profits argument would be inadmissible, to the extent Pascual relies on hearsay or lacks personal knowledge, and because those portions are not relevant to the ascertainment of damages analysis under Fed. R. Evid. 401, 402. Any consideration of lost profits or lost income here would be properly categorized as consequential damages that "must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *See Kenford Co. v. Cty of Erie*, 73 N.Y.2d 312, 319 (N.Y. 1989). "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007).

---

[8] In response to Defendants' submission of the "supplemental affidavit," Plaintiffs submitted a second Declaration from counsel John J.P. Howley with an exhibit entitled "Defendants' Response to Plaintiffs' Interrogatory No. 3." (ECF Nos. 56-1, 56-2.) As the Court is not considering the supplemental affidavit submitted by Defendants, the Court also will not consider the Second Declaration nor the attached exhibit. (*See* Pls. Reply. at 5 n.1.)

Defendants argue:

> The "lost income" or "lost profit" cannot be
> ascertained at the time of the execution of
> the contract because there is no way of
> knowing when a RN would preterminate; because
> there is no way of knowing where the RN would
> be assigned at, and because the future
> worksite facility is unknown, it cannot be
> known at the execution of the contract how
> much said worksite facility would be paying
> United Staffing for the services of its
> employees, as various healthcare facilities
> have different and varying pay schedules and
> pay rates.

(Defs. Mem. at 22-23.)

Therefore, Defendants' lost income and lost profit
arguments are clearly based on "losses in relation to its nursing
home clients, and thus properly categorized as consequential
damages." *See Paguirigan*, 2019 WL 4647648, at *11 n.9.  There is
no admissible evidence in the record that "any nurse contemplated,
or should have contemplated lost profit damages at the time the
contracts were executed," *see id.*, nor is there any admissible
evidence suggesting that Defendants themselves contemplated lost
profit damages at the time the standard contracts were executed.
*Cf. Shred-It USA, Inc. v. Bartscher*, No. 02-CV-4082 (JO), 2005 WL
2367613, at *11 (E.D.N.Y. Sept. 27, 2005) ("Shred-It claims that
it can recover its lost profits from the White & Case account.
Such a theory requires Shred-It to prove first that the allegedly
lost profits constitute damages caused by Bartscher's breach,
second that such lost profits are capable of being proved with

reasonable certainty, and third *that such a measure of damages was within the parties' contemplation at the time they entered into the Agreement.*") (emphasis added).

Finally, the standard contract's failure to list some or any of the costs contemplated by the liquidated damages provision in fact lends *more* support to finding the provision unenforceable. Unlike in *Paguirigan*, the plain language of the liquidated damages provision here reflects nothing of what costs may have been contemplated by the parties in including such a provision, let alone how the provision is a "reasonable measure" of anticipated damages from breach. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* 369 F.3d 34, 70-71 (2d Cir. 2004) (internal quotation marks and citation omitted) ("New York courts will sustain a liquidated damages provision 'only where the specified amount is a reasonable measure of the anticipated harm.'"); *compare Union Cap. LLC v. Vape Holdings Inc.*, No. 16-CV-1343 (RJS), 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017) ("Union offers no explanation for how the daily payment is even conceivably linked to the damages Union suffered as a result of Vape's failure to deliver its converted shares. Obviously, the provision serves only to encourage Vape to abide by the terms of the contract, and it thus functions as the prototypical forbidden penalty — an invalid 'added spur to performance.'") (citation omitted), *with GFI Brokers, LLC v. Santana*, Nos. 06-CV-3988 (GEL), 06-CV-4611 (GEL),

2009 WL 2482130, at *4 (S.D.N.Y. Aug. 13, 2009) (in assessing
enforceability of a liquidated damages provision, noting that
testimony from the party seeking enforcement "adequately explained
the difficulties GFI prospectively anticipated").

### D. Attendant Circumstances

The Court also concludes that the liquidated damages
provision is an unenforceable penalty after "due consideration for
the nature of the contract and the attendant circumstances." *See
U.S. Fid. & Guar. Co.*, 369 F.3d at 71 (citation omitted).  The
parties' respective bargaining power is also a factor when
determining "if one side is exacting an unconscionable penalty."
*PacifiCorp Cap. Inc, v. Tano, Inc.*, 877 F. Supp. 180, 184 (S.D.N.Y.
1995); *see also Glob. Crossing Bandwith, Inc. v. OLS, Inc.*, 566 F.
Supp. 2d 196, 202 (W.D.N.Y. 2008) (collecting cases).

Ferdinand Pascual is and was the Human Resources Manager
at United Staffing, where he has been employed for more than 15
years.  (Pls. 56.1 at ¶¶ 106-107; Defs. Resp. 56.1 at ¶¶ 106-107.)
Pascual was responsible for making sure that the nurses signed the
standard contract.  He was also responsible for explaining the
standard contract to nurses and answering their questions. (Pls.
56.1 at ¶¶ 108-10; Defs. Resp. 56.1 at ¶¶ 108-10.)  Plaintiff Ana
Myrene Espinosa testified that, on the date the contract was
presented to her, she "needed somebody to explain" the contract,
had "to bring it back on that day, the same day," "did not have

time to consult someone else," and "didn't really get the chance to read thoroughly the contract, because [she] had to go back before they closed the agency," and "Mr. Ferdi Pasquale [sic] asked [her] to submit it right away."   She also testified: "I do understand the contract. *It's just at the time I was really eager to work.*  I read it, scanned it really fast, and then signed." (ECF No. 40-28 ("Ana Myrene Espinosa Dep.") at 89:22-91:07 (emphasis added).)   In addition, when asked if there came a point when she complained to the United States embassy about the employment agreement, Plaintiff Magtoles testified: "No. I was nervous."  (ECF No. 40-26 ("Magtoles Dep.") at 106:15-106:18.)

Moreover, it is undisputed that Defendants were highly experienced in the practice of recruiting Filipino/Filipina nurses and in the use of their contracts that included the liquidated damages provision, which Defendants inserted into dozens of standardized contracts, in contrast to some nurses who relied on Defendants' representatives (such as Pascual) to explain the standard contract.  Furthermore, nothing in the record before the Court suggests the parties engaged in any negotiations in the inclusion of the provision, that Plaintiffs had any hand in drafting or including the liquidated damages provision, or that Plaintiffs had any particular "familiarity with American contract law." *See Paguirigan*, 2019 WL 4647648, at *8.

In short, from the undisputed facts, the Court finds that the parties' respective bargaining power was grossly unequal. Under these circumstances and based on the undisputed evidence in the record, the Court cannot find that the liquidated damages provision was a valid and enforceable term of the contract "made by the parties at the time they enter[ed] into their agreement." *See Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977). The Court also reiterates that if there is "any doubt" as to whether a liquidated damages clause is an unenforceable penalty or a permissible provision, courts should construe such a provision as a penalty. *See, e.g., Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2003) (collecting cases); *see also Jordache Enter., Inc. v. Glob. Union Bank,* 688 F.Supp. 939, 944 (S.D.N.Y. 1988) ("Hostility to liquidated damages clauses reflects a concern that such clauses are often unconscionably imposed by the stronger, or more sophisticated party on the weaker.").[9]

---

[9] The Court also notes the following, rather troublesome, facts. Felix Vinluan, one of Defendants' counsel in the instant action, was retained by Filipina nurse Ronariza Beltran (who is not a class member) to review her contract with United Staffing. Beltran relied upon Vinluan for legal advice in connection with the contract. At the same time, Vinluan was representing United Staffing in connection with Beltran's contract. (Pls. 56.1 at ¶¶ 117-19; Defs. Resp. 56.1 at ¶¶ 117-19.) Although Vinluan informed Beltran that he was also United Staffing's lawyer, Beltran testified that she did not sign anything waiving any conflicts of interest presented by Vinluan's dual representation of Defendants and their prospective employee. (ECF No. 45-11 ("Beltran Dep.") at 35:15-35:21.)

Defendants rhetorically dispute Plaintiffs' assertion that "Vinluan did not request or obtain from Beltran a waiver of conflicts of interest," speculating that "said waiver could have been granted through a different manner," but offer

## II.   Enforceability of Non-Compete Clause

### A. Declaratory Judgment

As an initial matter, Defendants do not argue that the non-compete clause is, in fact, enforceable.  Instead, Defendants state only that Plaintiffs have "failed to show that there is a 'substantial controversy' 'of sufficient immediacy and reality' to warrant the issuance of a declaratory judgment," and that "there is nothing in the record of the case that will indicate Defendants had threatened to enforce the 'non-compete' provisions of Plaintiffs' employment agreements."  (Def. Mem. at 24, 26); *see also Niagara Mohawk Power v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996).

Tellingly, Defendants have not represented that they will *not* seek enforcement, leaving nurses (and any of their potential employers) "uncertain as to whether [the nurse] will be embroiled in a lawsuit if [the nurse] accepts a position with [a competitor]." *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010) (determining that employer's contention that "Plaintiff has failed to identify any facts that indicate that Omnicare plans to enforce the covenant against her" was

---

no evidence of waiver.  (Defs. Resp. 56.1 at ¶ 120.)  Notably, Defendants' speculation is distinct from any admissible evidence that any such waiver *was* ever granted.  Vinluan, an "experienced New York lawyer who has represented United Staffing in employment and immigration matters for at least 10 years," (Pls. 56.1 at ¶ 154; Defs. Resp. 56.1 at ¶ 154), should have recognized the importance of a written waiver of a conflict so plain, but there is no record evidence that he obtained any written conflict waiver.

"facetious").    It  is  well-established  that  where,  as  here,
Plaintiffs  are  unsure  whether  they  can  pursue  other  employment  to
make  a  living,  clarification  and  resolution  of  the  uncertain
enforcement  of  the  liquidated  damages  provision  serves  "one  of  the
main  purposes  of  declaratory  judgments."  *See, e.g., id.*; *see also
Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,* 411 F.3d
384, 389 (2d Cir. 2005) ("In  order  to  decide  whether  to  entertain
an  action  for  declaratory  judgment,  we  have  instructed  district
courts  to  ask:  (1)  whether  the  judgment  will  serve  a  useful  purpose
in  clarifying  or  settling  the  legal  issues  involved;  and  (2)
whether  a  judgment  would  finalize  the  controversy  and  offer  relief
from  uncertainty.").

In sum, Defendants cannot have their cake and eat it too
— they cannot argue that Plaintiffs have not shown that Defendants
intend  to  enforce  the  agreement,  while  simultaneously  preserving
the  possibility  of  enforcement  down  the  line.  *See Arakelian*, 735
F. Supp. 2d at 41 (on summary judgment, holding that the employer
"cannot move to dismiss [employee's] claim; refuse to agree not to
enforce  the  Restrictive  Covenants  Agreement;  and  at  the  same  time
claim  that  [employee]  has  not  shown  that  it  intends  to  enforce  the
agreement").  The  Court  agrees  with  Plaintiffs  that,  "[h]aving
created uncertainty by including the nationwide non-compete clause
in  their  Standard  Contract,  defendants  should  not  be  able  to  keep

the nurses in a state of suspense and apprehension."  (ECF No. 56 ("Pls. Reply") at 6.)

## B. Legal Standard of Enforceability

Non-compete provisions are enforceable under New York law only if they are (1) reasonable in duration and geographic scope, (2) "necessary to protect the employer's legitimate interests," (3) "not harmful to the general public," and (4) "not unreasonably burdensome to the employee." *Flatiron Health, Inc. v. Carson*, No. 19-CV-8999 (VM), 2020 WL 1320867, at *19 (S.D.N.Y. Mar. 20, 2020) (citing *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999) (citations omitted)).  A violation of any prong renders the non-compete clause invalid.  *Id*.  Further, because restrictive covenants in employment agreements may restrain competition, "impinge on individual agency," and restrict "an employee's ability to make a living," New York courts subject such covenants to heightened judicial scrutiny.  *Id*. (citing *Oliver Wyman, Inc. v. Eielson,* 282 F. Supp. 3d 684, 693 (S.D.N.Y. 2017) (collecting cases)).

## C. Application

If a nurse employee were to leave United Staffing before completing the minimum number of hours over the course of three years, the nurse would be prohibited from:

> 1.   In any manner whatsoever, directly or indirectly, work as a nurse, practice nursing,

work as a physician's assistant, or otherwise
practice the art of/science of nursing; or

2. Directly or indirectly operate, own, lease
(as landlord or tenant), engage or participate
in as an owner, partner, employee, joint
venturer, shareholder, director, assignor,
seller, transferor, or as sales or marketing
agent or otherwise, in, for or in connection
with any business which competes with [United
Staffing] within the United States for a
period of THREE (3) YEARS after the EMPLOYEE
severs his/her relationship with [United
Staffing].

(*See, e.g.,* Magtoles Contract at 3.)

### i.  **Reasonable in duration and geographic scope**

Here, the sheer nationwide breadth of the geographic
scope alone dooms the clause.  Both subsections are unreasonable
in geographic scope. As this Court previously noted in denying
Defendants' motion to dismiss the action:

The limitation that a future employer be in
competition with United Staffing in the United
States – as well as the three-year time
limitation – appear to apply only to the
clause's second subsection.  The first
subsection, on its face, prohibits former
employees from working as nurses without any
limitation as to duration, geography, or a
future employer's status as a competitor.

*See Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850
(KAM)(PK), 2021 WL 6197063, at *6 (E.D.N.Y. Dec. 30, 2021).

It is undisputed that United Staffing places nurses only
at facilities in New York City and on Long Island, and that United
Staffing has never placed a nurse anywhere outside the State of

New York.  (Pls. 56.1 at ¶¶ 35-36; Defs. Resp. 56.1 at ¶¶ 35-36.)
The ban that Nurse Plaintiffs cannot "operate, own, lease (as
landlord or tenant), engage or participate in" *any* business in
competition with United Staffing *within the United States* is baldly
unreasonable.  *See, e.g., Good Energy, L.P. v. Kosachuk*, 49 A.D.3d
331, 332 (1st Dep't 2008) (non-compete covenant was unreasonable
because employer operated in only eight states); *compare Yedlin v.
Lieberman*, 102 A.D.3d 769, 770 (2d Dep't 2013) ("The restrictive
covenant here *applied to the entire United States*, and would have
*precluded the plaintiff from merely 'participating'* in projects
that involved the defendants' present or former clients.")
(emphasis added), *with Battenkill Veterinary Equine P.C. v.
Cangelosi*, 1 A.D.3d 856, 857-58 (3d Dep't 2003) (finding a 35-mile
restriction that was "narrower than [employer's] service area" to
be "reasonable").

### ii.  Necessary to protect the employer's legitimate interests

Cognizable employer interests include the "(1)
protection of trade secrets, (2) protection of confidential
customer information, (3) protection of the employer's client
base, and (4) protection against irreparable harm where the
employee's services are unique or extraordinary." *Flatiron
Health, Inc.*, 2020 WL 1320867, at *19.  Nothing in the record comes
even close to implicating any of these, or any other, employer
interests.  Again, Defendants have simply made no arguments about

36

what possible interest they would have in such an overbroad non-compete provision and, as before, this Court "struggles to imagine how a nurse would possess United Staffing's trade secrets, or how every nurse who signed United Staffing's 'standard employment contract' offered unique or extraordinary services." *See Magtoles*, 2021 WL 6197063, at *7.

### iii.   Not harmful to the general public

Although the Court recognizes that there are other nurses in the New York area, it would be plainly harmful to the general public if dozens of licensed nurses and practitioners were prohibited from contributing their services to an industry as valuable and important as nursing. *See Flatiron Health, Inc.*, 2020 WL 1320867, at *22 (finding that "[p]reventing [employee] from working at the job where he would be most productive and make the largest impact . . . inflicts not only a private cost to [employee] but also a social cost," and recognizing that "[o]n that public policy ground, New York courts disfavor broad non-competes"). Moreover, as Defendant Santos himself affirms, there is an "ever-growing need of healthcare professionals to take care of our aging American population" and there are not "enough locally-produced registered nurses to take care of our own people." (Santos Decl. at ¶ 2.)

### iv.   Not unreasonably burdensome to the employee

A provision that either prevents Plaintiffs from being involved in any capacity in their industry anywhere in the United States, or, even more broadly, simply anywhere that is not United Staffing, is patently unreasonable and unenforceable. *See Good Energy, L.P.*, 49 A.D.3d at 332 ("[T]he covenant effectively excludes defendant from continued employment in the industry."); *see also Brown & Brown, Inc. v. Johnson*, 34 N.E.3d 357, 370 (N.Y. 2015) ("New York law provides that covenants not to compete should be strictly construed because of the powerful considerations of public policy which militate against sanctioning the loss of a person's livelihood.") (collecting cases) (cleaned up).

For the foregoing reasons, the Court declares the non-compete clause in the employment contracts to be unenforceable and enjoins Defendants from attempting or threatening to enforce it.

## III.   Breach of Contract

### A. Legal Standard

To recover for breach of contract under New York law, "a plaintiff must prove (a) the existence of a contract between plaintiff and defendant; (b) performance of the plaintiff's obligations under the contract; (c) breach of the contract by the defendant; and (d) damages to the plaintiff caused by the defendant's breach." *See Javier v. Beck*, No. 13-CV-2926 (WHP), 2014 WL 3058456, at *9 (S.D.N.Y. July 3, 2014).

In order to decide if a contract's terms were breached, a court considers whether the contract at issue is clear or ambiguous, and interprets the meaning of the contract language. "In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). "Under New York law . . . the question of whether a written contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). "Ambiguity is determined by looking within the four corners of the document, not to outside sources," *Kass v. Kass*, 91 N.Y.2d 554, 566 (N.Y. 1998), and if one party's interpretation of the contract would "strain[] the contract language beyond its reasonable and ordinary meaning," the court is not required to find the language ambiguous. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (citing *Bethlehem Steel Co. v. Turner Const. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957)). If the contract is not ambiguous, then its meaning is likewise a question of law for the court to decide. *JA Apparel Corp.*, 568 F.3d at 397. In interpreting an unambiguous contract, the "court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby,' but the court is not to consider any extrinsic evidence as to the parties' intentions." *Id.* (citations omitted).

### B. Application

The relevant provision ("prevailing wages provision") in the standard contract states:

> The EMPLOYER undertakes and agrees to pay the EMPLOYEE a salary or wage that complies with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health care facility where EMPLOYEE works, applicable to Registered Nurses (RNs) and health care givers.

(*See, e.g.,* Magtoles Contract at 4.)

The only issue here is whether Defendants breached this provision of the contract. Plaintiffs argue that Defendants breached this provision in several ways, each of which the Court shall address in turn. (*See* Pls. Mem. at 15-16.)

### i. Failure to Pay All Hours Worked

Plaintiffs first argue that Defendants breached the prevailing wages provision by "failing to pay the Nurse Plaintiffs and other class members for all the hours they worked." (Pls. Mem. at 15-16, citing 56.1 Statements at ¶¶ 47-73.) Plaintiffs' evidence includes Defendants' failure to pay all the hours when Plaintiffs worked overtime at their respective facilities or beyond the time that their shifts were scheduled to end, or paying Plaintiffs less than the hours on their timesheet records. (*See generally* ECF No. 40-27 ("Tan Dep."); Pls. 56.1 at ¶¶ 63-71 and exhibits cited thereto; Defs. Resp. 56.1 at ¶¶ 63-71 and exhibits cited thereto.)

### a. *United Staffing's Billing and Payment System*

The parties' various purported disputes ultimately rest on one, overarching issue: Although timesheet and payroll records demonstrate that some nurses were not paid for all of the hours their timesheets reflect, Defendants contend that they are not in breach of the contracts because they "rely on the figures of work-hours computed and validated by the facilities" when payroll is prepared. (ECF No. 40-33 ("Ofendo-Reyes Decl.") at ¶ 9.)

Ofendo-Reyes, United Staffing's Financial Controller since 2005, described the billing and payment system, in part, as follows:

> We at United Staffing do not have a hand or participation in the monitoring of our employees' work-hours at the facilities, in the computation or counting of our employees' work-hours, and in the validation of our employees' work-hours. Each facility has its own procedures and policies on how they do these functions, and each facility has its own staff or employees performing these functions. . . .
>
> We at United Staffing rely on the figures of work-hours computed and validated by the facilities when we prepare the payroll of our company. If the time sheets reflect that an employee had worked thirty seven (37) hours for that week, then that's what we prepare and process as the number of hours that our employee has to be paid. . . .
>
> We at United Staffing never make any deductions on our employees' work-hours as validated by the facilities. We always follow the computations of the healthcare facilities.

> . . .
>
> Our healthcare facility-clients have varied
> and different work-shifts, work schedules, and
> length of meal time or break periods.
> . . .
>
> The number of validated work-hours by each of
> our RN-employees as evidenced by the time
> sheets or time records we receive from each of
> our healthcare facility-clients is our basis
> for sending our invoices or for billing our
> healthcare facility-clients. This means that
> if we paid our RN-employee so many hours for
> a particular work-week, that would also be the
> number of hours that we would bill our
> facility-client.

(Ofendo-Reyes Decl. at ¶¶ 5, 9, 12, 18.)

### b. "Nurses' Compensation"

Plaintiffs assert that "[t]he nurses' compensation was not contingent on the amount paid to United Staffing by the facility where the nurse was assigned." (Pls. 56.1 at ¶ 20.) Defendants dispute Plaintiffs' assertion and respond: "Nurses' compensation was contingent on the amount paid to United Staffing by the facility where the nurse was assigned, so long as the nurses' compensation was at least, if not more than, the prevailing wage rates." (Defs. Resp. 56.1 at ¶ 20.)

Defendants do not argue that the provision itself is ambiguous or that its meaning is not clear on its face. Defendants instead rely (almost exclusively) on the extrinsic fact that the healthcare facilities were responsible for validating employee hours, which determined the amount that Defendants paid their

nurses and billed their healthcare-facility clients where Defendants assigned their nurses to work. The Court, however, reiterates that Plaintiffs allege a claim for breach of the contract between *Plaintiffs* and *Defendants*. Therefore, in assessing this purported dispute, the Court must first determine whether the contract is ambiguous.

The prevailing wages provision in the parties' contract is not conditioned on the hours validated by Defendants' third-party healthcare-facility clients. The provision states that United Staffing "undertakes and agrees to pay" its nurse employees a salary or wage "that complies with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health care facility[.]" (*See, e.g.,* Magtoles Contract at 4.) The language of this provision is unambiguous. *See, e.g., Abundance Partners LP v. Quamtel, Inc.,* 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) ("A contract is unambiguous if on its face it is reasonably susceptible of only one meaning.") (internal quotation marks and citation omitted) (cleaned up)). Nowhere does the contract (let alone the section governing payments to employees, entitled "Article II – Schedule/Rates of Wages") state or even suggest that Defendants' contractual obligation to pay employees prevailing wages depends on the particular hours computed by or the validation system of, Defendants' respective facility clients. Defendants do not even bother arguing that the contract says

otherwise. *See, e.g., Deutsche Bank Sec., Inc. v. Rhodes,* 578 F. Supp. 2d 652, 662 (S.D.N.Y. 2008) ("If the agreement sets forth the parties' intent clearly and unambiguously, the Court need not look to extrinsic evidence to determine the parties' obligations under the contract.") (collecting cases); *see also Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (holding that "parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself *rather than from extrinsic evidence as to terms that were not expressed*") (emphasis added).

Moreover, the parties to the contract are unambiguously United Staffing, through its sole owner, president, and CEO Santos, and their nurse employees. Defendants, again, do not argue about the actual substance or interpretation of the contract. They do not assert that there was, for example, an assignment of contract between Defendants and the healthcare facilities, or that the facilities were otherwise a party to the contract at issue, thereby altering Defendants' contractual obligations to Plaintiffs. Accordingly, the Court finds that there is no genuine dispute of material fact as to whether the nurses' compensation was to be paid as specified in the contract, and was not contingent on the amount paid to United Staffing by the facility where the nurse was assigned. *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 312 (2d Cir. 2008) ("Under Rule 56, it is the

court's responsibility to determine whether the opposing party's response to the assertion of a material fact presents a dispute that is genuine."); *cf.* *JA Apparel Corp.*, 568 F.3d at 396 ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in litigation.").

### c. Timesheet and Payroll Records

The undisputed record before the Court establishes that Defendants breached the contract's prevailing wages provision by failing to pay multiple class members for all the hours they worked at Defendants' respective client facilities.

When asked if there were times when she worked hours she was not paid for, Plaintiff Tan testified that although she was scheduled to work "from 3:00 [p.m.] to 11:00 [p.m.]," she instead went home "by 2:00 or 3:00 in the morning," and that she was not paid for the hours between 11:00 p.m. and 2:00 a.m. or 3 a.m.[10] (Tan Dep. at 161:11-161:21.)  Further, "Tan was only paid up to the time her shift was scheduled to end. She was not paid for the extra hours."  (Pls. 56.1 at ¶ 54.)  Defendants "dispute" Tan's

---

[10] Defendants dispute Plaintiffs' assertion: "When Tan was scheduled to work the 3 p.m. to 11 p.m. shift, she usually ended up working until 2 a.m. or 3 a.m." but was not paid for hours worked past 11 p.m.  Defendants respond that the statement "generalizes Tan's work schedules, although the statement may be true only in [sic] few occasions while she worked at the Regal Heights facility and only if it refers to her sometimes working until 2 am, but not until 3 am." (Defs. Resp. 56.1 at ¶ 51.)  The Court finds that Defendants' failure to proffer admissible evidence fails to create a genuine dispute, because Defendants admit the relevant part of the assertion — that there were times when Tan worked multiple hours past her scheduled shift hours, for which she was not paid.

sworn factual assertion by responding that "Tan, like all other employees of Defendants, was paid according to the validated number of work-hours given by her facility to Defendants." (Defs. Resp. 56.1 at ¶ 54.)  The Court finds that Defendants' contention fails to present a genuine dispute of material fact because it does not directly (or even, indirectly) respond to the substance of the assertion — that Tan "was not paid for the extra hours" she worked past her shift, a violation of the contract's clear language that Defendants pay their employees prevailing wages for this work.

Defendants also admit the following: Tan told Pascual that she was working more hours than United Staffing was paying her for; Tan complained to Pascual that she was not being paid for the additional hours she worked when she worked past the scheduled end of her shift; Plaintiff Magtoles complained to Pascual several times that her scheduled work hours were from 7 a.m. to 3 p.m., but she was actually working until 5 p.m. or 6 p.m.; and Plaintiff Ana Myrene Espinosa complained to Pascual that she was not being paid properly. (Defs. Resp. 56.1 at ¶¶ 57-61.)  In Defendants' Responsive 56.1 Statements to Plaintiffs' evidence and assertions, Defendants assert only that "whenever [Pascual] received complaints about wages, such as from [nurse], [he] would refer these to the Accounting Department and sometimes would try to address the concerns by calling the concerned facility and ask them to investigate if the complaint was true and to help the

nurses address their concerns." (*Id.*)  The portions of Pascual's deposition that Defendants cite in support of this assertion do not address the outcome of their purported requests for an investigation, and consequently, Tan's showing that she was not paid for some of the hours she worked is not disputed. (*See* ECF No. 40-30 ("Pascual Dep.") at 63:17-64:18.)

Defendants also admit the following: "United Staffing received timeclock records from Adira at Riverside Rehab showing that, on June 28, 2020, Nurse Ellaine Garduce clocked in at 7:06 a.m. and clocked out at 4:07 p.m. for a total of nine hours, but *United Staffing paid her for only seven hours*." (Pls. 56.1 at ¶ 63; Defs. Resp. at ¶ 63 (emphasis added).)  Further, Defendants "partially admit[] and partially dispute[]" Plaintiffs' assertion by adding, "with the understanding that United Staffing paid the validated number of hours, and that Adira, with its own policies and practices, might have deducted break time or meal period, and sent the validated number of hours to United, which United did pay." (*Id.*)  In a substantively identical manner, Defendants also admit the same factual assertion that *seven other nurses* (at their varying facilities that validated their timesheet records) worked hours for which they were not paid. (Pls. 56.1 at ¶¶ 64-71; Defs. Resp. 56.1 at ¶¶ 64-71.)  Finally, the Court notes that Defendants drafted and signed the contract with dozens of nurses and had ample opportunity to include in the contracts any explanation — or even

47

mere reference — to the billing and payment process involving Defendants' healthcare-facility clients that Defendants now heavily rely on to dispute Plaintiffs' breach of contract claim.

In sum, the Court finds that the plain language of the contract is unambiguous, again noting that Defendants do not argue otherwise.  Simply put, Defendants had a contractual obligation to pay prevailing wages to its nurses and it breached this obligation in multiple ways, as outlined above, and cannot expect the Court to exceed the explicit terms by importing extrinsic evidence. Courts may "not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Abundance Partners LP v. Quamtel, Inc.,* 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) (citation omitted); *see also Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 298 (S.D.N.Y. 1997) (summary judgment "is clearly permissible when the language of the contract provision in question is unambiguous").  For the foregoing reasons, the Court finds that Defendants have failed to raise a genuine issue of fact for trial as to Plaintiffs' breach of contract claim predicated on Defendants' failure to pay Plaintiffs for all hours worked.

### ii.  Deductions for meals or breaks not allowed or taken

Plaintiffs also argue that United Staffing breached the contracts' prevailing wages provision by "deducting time for breaks that were not allowed or taken."  (Pls. Mem. at 15.)

Plaintiffs present evidence that: "The Nurse Plaintiffs were supposed to take 30-minute breaks when they worked an eight-hour shift, but they were not allowed or able to take breaks." (Pls. 56.1 at ¶ 74; *see also, e.g.,* Tan Dep. at 62:15-63:20 (testifying that nurses were "not able to take" a break because "we couldn't even eat because of the kind of the work that we have" at the facility, and that for "more than a year in Regal Heights," she "only can remember probably less than 10 breaks" that she took).)

Defendants dispute Plaintiffs' assertion that "Nurse-Plaintiffs were not allowed or were not able to take breaks," arguing that "Nurse-Plaintiffs were given their meal breaks, depending upon the facility where they worked." (Defs. Resp. 56.1 ¶ 74.) Defendants also cite the following from Ofendo-Reyes' Declaration: "Some facilities give the employees thirty minutes of meal period only. Other facilities would give the employees one full hour of meal time. Most facility-clients follow the 'no work, no pay' rule. So, during meal periods, which are always controlled and determined by the facilities themselves, they do not count any compensable time to our employees." (Ofendo-Reyes Decl. at ¶ 12; Defs. Resp. 56.1 at ¶ 74.) Notwithstanding that the portion of Ofendo-Reyes' Declaration cited is not based on personal knowledge, Defendants assert only that "some facilities" gave breaks of varying lengths. Defendants fail to submit evidence creating a genuine dispute as to Plaintiffs' showing that

Plaintiffs were not allowed or were too busy, to take breaks, and were not paid for work during breaks.

The Court agrees with Plaintiffs that Defendants confuse the issue here.  Plaintiffs are not claiming that they should have been paid for breaks or meal periods that they actually took, nor are Plaintiffs disputing facilities' "no work, no pay" rule. Instead, Plaintiffs are claiming and submit evidence (which is not comprehensible, as explained *infra*) that Defendants deducted time "for breaks that were not allowed or taken."  The Court notes that Ofendo-Reyes lacks personal knowledge as to whether the facilities prohibited Plaintiffs from taking breaks but nonetheless deducted hours for breaks.  Nonetheless, the Court cannot grant summary judgment on those grounds because Plaintiffs have not submitted evidence that would allow the Court to conclude that any disparity between the hours the Nurse Plaintiffs worked versus the hours United Staffing actually paid were attributable to deductions for meal periods or breaks.  Specifically, in support of their assertions, Plaintiffs vaguely cite, in part, to "Exhibits 15–17" (ECF Nos. 43-17, 43-18, 43-19), more than 400 pages of payroll and time records for Plaintiffs Magtoles, Tan, and Ana Myrene Espinosa. Plaintiffs, however, provide no pin citations nor any other guidance or analysis of their voluminous records to the Court to support their assertion that "Nurse Plaintiffs were paid for only 7.5 hours per day when they actually worked eight hours during

their regular shifts." (Pls. 56.1 at ¶ 75.) It is well-established that a court has no obligation to sift through hundreds of pages of records — in this case, extremely detailed records spanning days, weeks, and multiple years of payroll and timesheet documents — to find support for a party's 56.1 Statement. *See, e.g., Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (citing *Guarino v. Brookfield Twp. Trs.,* 980 F.2d 399, 405–06 (6th Cir. 1992) ("Nothing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record . . . . What concept of judicial economy is served when judges . . . are required to do the work of a party's attorney?")).

Therefore, the Court denies summary judgment on these grounds because Plaintiffs failed to present evidence in a useful manner establishing that Defendants breached the prevailing wage provision by deducting time for meal periods or breaks Plaintiffs did not actually take.

### iii.    Failure to give Plaintiffs 2,000 hours of work per year

Plaintiffs also argue that Defendants breached the contract by failing to give the Nurse Plaintiffs and other class members sufficient full-time work to achieve the contract requirement of at least 2,000 hours per year (and at least 6,000 hours over three years). (Pls. 56.1 at ¶¶ 81-89; *see, e.g.,*

Magtoles Contract at 2-4, Article I.1(c), Article I.4(a).) Defendants, in turn, ignore the contract requirements that Plaintiffs work at least 2,000 hours per year and 6,000 hours over three years, and argue that there is nothing in "United Staffing's standard employment contracts with its employees that required it to give its employees 'full-time work', much less '40 hours per week.'" (Defs. Mem. at 18.)  Defendants also argue that even assuming, *arguendo,* that such a provision existed, that "the term 'full-time' is subject to various interpretations, and may mean at least thirty (30) hours per week."[11]  (*Id.* at 19.)

Defendants appear to misinterpret Plaintiffs' assertion in Plaintiffs' moving papers and 56.1 Statements.  Plaintiffs' arguments about "full-time" work rely on the contract provision requiring at least 2,000 hours of work per year, and do not even mention a specific number of hours a week.  Nor do Plaintiffs' moving papers argue that Defendants were obligated by contract to give nurses "40 hours per week" of work.  Plaintiffs' 56.1 Statements focus "the lack of full-time work" claim on a six-week period between October 5 to November 15, 2019, where Plaintiffs Magtoles and Tan were not assigned any work by United Staffing. (Pls. 56.1 at ¶ 84; Defs. Resp. 56.1 at ¶ 84.)  It is undisputed

---

[11] The Court finds immaterial factual assertions regarding "full-time work" because this term does not appear in the contract.  The Court notes, however, that the 2,000 hours specified in the contract divided by 52 weeks per year is approximately 38.46 hours per week, which could be considered "full time."

that United Staffing did not pay Magtoles and Tan any compensation during those six weeks; that Magtoles and Tan had no income during those six weeks; that, during those six weeks, Magtoles and Tan earned no credit towards the 6,000 hours requirement (and thereby, no credit towards the 2,000 hours per year requirement) specified in their contracts; and that, during those six weeks, Magtoles and Tan had no ability to work anywhere else because of the contractual provision requiring that they work exclusively for United Staffing. (*See* Pls. 56.1 at ¶¶ 85-88; Defs. Resp. 56.1 at ¶¶ 85-88.)

Plaintiffs also state in their 56.1 Statement that, as a result, "United Staffing's failure to give nurses at least 2,000 hours of work per year resulted in the Nurse Plaintiffs being paid less than the annual prevailing wage." (Pls. 56.1 at ¶ 90.) Defendants object to this assertion and respond that it is "not a statement of fact." (Defs. Resp. 56.1 at ¶ 90.) The Court analyzes this claim based on the contract provision requiring the employee to work at least 2,000 hours per year (and at least 6,000 hours over three years). (*See, e.g.,* Magtoles Contract at 2-4, Article I.1(c), Article I.4(a).) Defendants' opposition cites to depositions of Plaintiffs Magtoles and Tan to support Defendants' assertion that they were "in-between jobs, as they resigned from Meadowbrook facility without enough notice for United to find new assignments for them." (Defs. Resp. 56.1 at ¶ 84.) As a result

of this genuine dispute of material fact, summary judgment on Plaintiffs' breach of contract claim cannot be awarded on the grounds that Defendants failed to give Nurse Plaintiffs and other class members sufficient work to achieve at least 2,000 hours of work per year.

### iv.  Failure to Pay the Prevailing Wage for All Hours Worked

Finally, Nurse Plaintiffs argue that Defendants failed to pay them the prevailing wage for all hours worked.  (Pls. Mem. at 15, citing 56.1 Statements at ¶¶ 91-105.)  Plaintiffs' assertions primarily involve Defendants paying nurses who worked at Regal Heights Nursing & Rehabilitation Center ("Regal Heights") less than the prevailing wage rate during the nurses' orientation periods.  Defendants argue that "Magtoles, Tan and Espinosa each voluntarily signed an orientation wage rate agreement with United Staffing, whereby each of them agreed to be paid $15.00 during their orientation period at Regal Heights."  (Defs. Mem. at 15.)

The Orientation Agreement — a letter addressed to each nurse from Pascual — states in part:

> Regal Heights Nursing & Rehabilitation Center, as per their policy, will not pay you/us with an RN rate for the first week that you attend the orientation program. However, in fairness to you and out of our benevolence, we will give you an allowance rate of $15/hour for the duration of [the] first week of the orientation to cover your transportation, food allowance, and a little extra to tide you over during the period of orientation. This is not

> a company policy and we consider your case as
> an exception.

(*See, e.g.,* ECF No. 40-51 ("Orientation Agreement") at 3.)

It is undisputed that "[d]uring their first two weeks of work at the Regal Heights Rehabilitation and Care Center in Queens, New York, the Nurse Plaintiffs were paid only $15.00 per hour." (Pls. 56.1 at ¶ 93; Defs. Resp. 56.1 at ¶ 93; *see also* Defs. Mem. at 15 ("It is conceded that Plaintiffs Magtoles, Tan and Espinosa were paid $15.00 per hour during their orientation at the Regal Heights facility sometime in November 2019.")) This plainly breaches the prevailing wage provision of the standard contract, which provides no exceptions or qualifications as to United Staffing's obligation to pay its employee "prevailing wages," nor does anything in the contract suggest that nurses would be paid less during their orientation periods.

Nowhere in the Orientation Agreement or the standard contract does it state that the Orientation Agreement supersedes the standard contract, nor do Defendants even argue now that the Orientation Agreement should supersede the standard contract, or be treated as part of the standard contract. Defendants merely assert that such agreements "were the law between the contracting parties, and United Staffing abided with such agreements." (Defs. Mem. at 15.) To the contrary, Section 2(a) of Article VI of the standard contract states: "This Agreement constitutes the entire

Agreement between the parties and shall as of the effective date *hereof supersede any and all other Agreements between the parties*." (*See, e.g.,* Magtoles Contract at 6 (emphasis added).)   The effective dates of Magtoles', Tan's, and Ana Myrene Espinosa's standard contracts were respectively November 22, 2018, November [sic], 2018, and September 17, 2019 — all dates substantially preceding the orientation start date of November 13, 2019. (Magtoles Contract at 7-8; Tan Contract at 7-8; Ana Myrene Espinosa Contract at 7-8; Orientation Agreement at 2-4.)   It is also undisputed that the prevailing wage for an RN was $32.21 per hour in Queens County during 2019.   (Pls. 56.1 at ¶ 92; Defs. Resp. 56.1 at ¶ 92.)

On these facts, considering that both the standard contract and the Orientation Agreement are unambiguous, liability has been established against Defendants for breach of contract for class members who were required to sign the Regal Heights Orientation Agreement and thus were paid below the prevailing wage during the orientation period.   *See, e.g., Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms.") (citing *South Rd. Assocs. LLC v. IBM,* 826 N.E.2d 806, 809 (N.Y. 2005)).

## IV.   Piercing the Corporate Veil

Plaintiffs also seek to hold Defendant Santos individually liable for breach of contract by piercing the corporate veil of United Staffing. (Pls. Mem. at 21-22.) Santos signed the standard contract in his corporate capacity as sole owner, president, and CEO of United Staffing, rather than in his individual capacity.

As Defendants "do not specifically oppose, or otherwise address," Plaintiffs' summary judgment motion to pierce the corporate veil as to Defendant Santos, they have "seemingly abandoned any defense to that claim." *See Alvarado v. GC Dealer Servs. Inc.*, 511 F. Supp. 3d 321, 353-54 (E.D.N.Y. 2021) (granting a portion of plaintiffs' motion for summary judgment on the grounds that defendants had not addressed, and thus abandoned defense of, the issue); *A.H. by Horowitz v. Precision Indus. Maint. Inc.*, No. 19-CV-298 (FJS/CFH), 2021 WL 2417610, at *2 (N.D.N.Y. June 14, 2021) (holding that the defendants abandoned affirmative defenses because they "fail[ed] to refute or even address these issues in either their opposition to Plaintiffs' motion [for summary judgment] or their cross-motion for summary judgment"); *see also Azeez v. City of New York*, No. 16-CV-342 (NGG) (SJB), 2018 WL 4017580, at *6 (E.D.N.Y. Aug. 22, 2018) ("Ordinarily, any issues not addressed in an opposition brief are deemed abandoned by the party opposing the motion.")

In *Jackson v. Fed. Express*, the Second Circuit held that, "[w]here abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended." 766 F.3d 189, 196 (2d Cir. 2014); *see also Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143-44 (2d Cir. 2016) (reiterating the Second Circuit's holding in *Jackson*). The Second Circuit's reasoning in *Jackson* was as follows:

> [T]here is a relevant distinction to be drawn between fully unopposed and partially opposed motions for summary judgment in counseled cases. While the opponent to such a motion is free to ignore it completely, thereby risking the admission of key facts and leaving it to the court to determine the legal merits of all claims or defenses on those admitted facts, a partial opposition may imply an abandonment of some claims or defenses. Generally, but perhaps not always, *a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others.*

766 F.3d at 196 (emphasis added).

Here, the Court concludes that Defendants intended to and did abandon any defense to the portion of Plaintiffs' motion seeking a finding piercing the corporate veil as to Defendant Santos. (Pls. Mem. at 21-22.) The circumstances here reflect a "partial response to a motion," as discussed in *Jackson*. *Id.* at 197 (defining a "partial response to a motion" as one "referencing some claims or defenses but not others"). "Preparation of a

response to a motion for summary judgment is a *particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses*. Indeed, Rule 56 is known as a highly useful method of narrowing the issues for trial." *Id.* at 196 (emphasis added).

Defendants' opposition brief — although addressing Plaintiffs' other grounds for summary judgment and despite devoting about a third of its pages to specifically defending against Plaintiffs' breach of contract claim — makes no mention of piercing the corporate veil, let alone any reference to Plaintiffs' arguments in support. (*See generally* Defs. Mem. at 9-19); *see also Netherlands Ins. Co. v. Selective Ins. Co. of Am.,* No. 14-CV-7132 (KPF), 2016 WL 866348, at *7 (S.D.N.Y. Mar. 3, 2016) (granting declaratory judgment on an issue in plaintiff's favor because "Defendant has abandoned any arguments regarding [the issue] because it failed to discuss this issue in its response brief"); *LPD New York, LLC v. Adidas Am. Inc.,* No. 15-CV-6360 (MKB), 2022 WL 4450999, at *27 (granting defendants' summary judgment as to certain counterclaims because plaintiff did not dispute or respond to the counterclaims "in its memorandum in opposition . . . and therefore has abandoned its defense of these claims") (also collecting cases). Defendants also did not assert any additional facts in opposition to piercing the corporate veil in their Responsive 56.1 Statements, even though those Statements

span 53 pages and contain 162 Statements, each of which Defendants responded to.  (*See generally* Defs. Resp. 56.1.)

Moreover, Defendants here are counseled parties and thus, their lack of opposition to the corporate veil issue appropriately reflects "a decision by a party's attorney to pursue some claims or defenses and to abandon others." *Jackson*, 766 F.3d at 196.

> Where a partial response to a motion is made— *i.e.,* referencing some claims or defenses but not others—a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se,* the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. *In contrast, in the case of a counseled party*, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.

*Id.* at 197-98 (emphasis added).

In addition, Defendants' counsel Felix Vinluan "is an experienced New York lawyer who has represented United Staffing in employment and immigration matters for at least 10 years." (Pls. 56.1 at ¶ 154; Defs Resp. 56.1 at ¶ 154.)  Thus, the Court finds from the papers and circumstances viewed as a whole, as explained above, that Defendants have abandoned any defense or rebuttal against Plaintiffs' summary judgment motion to pierce the corporate veil as to Defendant Santos and, consequently, Plaintiffs' motion on that issue is granted.

## V.  TVPA Claims

The TVPA provides a private right of action to persons who have been subjected to forced labor.  18 U.S.C. § 1595(a).  A defendant is liable for forced labor when he "knowingly provides or obtains the labor or services of a person" by any of the following means:

> (1)  by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2)  by means of serious harm or threats of serious harm to that person or another person;
> (3)  by means of the abuse or threatened abuse of law or legal process; or
> (4)  by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

*Id.* § 1589(a).

Plaintiffs argue that Defendants are liable under the second, third, or fourth subsections of Section 1589(a).

### A. § 1589(a)(2): Serious Harm or Threats of Serious Harm

TVPA § 1589(c)(2) defines "serious harm" as:

[A]ny harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

TVPA § 1589(c)(2); *see also Paguirigan*, 2019 WL 4647648, at *16 (stating that § 1589(c)(2) "defines serious harm broadly and includes financial harm as a means by which someone can be threatened under the TVPA").

Thus, "the relevant question" under § 1589(c)(2) as applied to § 1589(a)(2) is whether "defendants' conduct constituted a threat of harm serious enough to 'compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.'" *Paguirigan*, 2019 WL 4647648 at *16. "This standard is a hybrid one," and the inquiry may "consider the 'particular vulnerabilities of a person in the victim's position,' but [must also] find that 'her acquiescence be objectively reasonable under the circumstances.'" *Id.* (citing *United States v. Rivera,* 799 F.3d 180, 186-87 (2d Cir. 2015)).

Defendants first recycle their arguments as to why the liquidated damages provision is enforceable. (*See* Defs. Mem. at 27-28.) As this Court has already found, the liquidated damages provision specifying, *inter alia*, harsh financial consequences, is "unenforceable as a penalty under New York law," and therefore, "this argument fails." *See Paguirigan*, 2019 WL 4647648 at *17. The liquidated damages provision therefore "constitutes a threat of sufficiently serious financial harm to compel a reasonable

person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm" under the TVPA. *Id*. at *18 (internal quotation marks omitted).

> Plaintiffs' TVPA claims . . . fail because they rest on the factually unsupported assumption that all of the recruited RNs subjectively felt compelled to provide labor or services to United Staffing due to the terms of their employment contracts. It is beyond belief that each and every recruited RN has continued to provide labor for United Staffing only because of the contractual obligations contained in their employment contracts, and not out of a desire to continue working for United Staffing, after they had applied for a position with United Staffing, obtained a visa, and moved thousands of miles to voluntarily accept the position.

(Defs. Mem. at 30-31.) Defendants then argue that, in the alternative, "[e]ven if the terms of the contract are unenforceable, Plaintiffs utterly fail to set out facts admissible in evidence which are sufficient to establish that United Staffing violated the TVPA in a class action setting solely based on the terms of the employment contracts, because they fail to prove facts that would show that each and every one of the recruited RNs" only rendered labor because of the contract provisions. (*Id*. at 31.)

Defendants' arguments fail because they have a mistaken view of the law. As stated above, the *language of the TVPA itself* defines "serious harm" as conduct that would compel "*a reasonable*

*person of the same background and in the same circumstances* to perform or to continue performing labor or services in order to avoid incurring that harm." TVPA § 1589(c)(2) (emphasis added). Further, "in the class action context, the inquiry will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work. Instead, the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions." *See Paguirigan*, 2019 WL 4647648, at *16 (internal quotation marks and citation omitted). In addition, the TVPA also "applies to subtle, nonviolent threats that may still effectively compel an individual to keep working." *Id*. (citation omitted) (holding that testimony from several nurses stating "they were never verbally threatened" was "insufficient to avoid TVPA liability").

Defendants next argue that to their knowledge, "there is not a single case where a court had held that a defendant could be liable under the TVPA's forced labor provision solely because it entered into an employment contract containing a provision that was found to be an unenforceable penalty." (Defs. Mem. at 31.) Defendants again misunderstand the law. The inquiry under the TVPA does not turn on such a specific issue. Rather, other considerations contribute to the finding of "serious harm" and liability under § 1589(a)(2) here, including the Court's findings

64

that Defendants breached the plain language of the employment contract in multiple ways, and included an unenforceable non-compete clause into the contract prohibiting the nurses from working in the nursing industry in the United States for three years. *See Paguirigan*, 2019 WL 4647648, at *18 (in finding that employment agency had violated TVPA § 1589(a)(2), considering that the agency had breached the wages provision of the employment contract); *see also Dale Carmen v. Health Carousel, LLC,* No. 20-CV-313, 2021 WL 2476882, at *7 (S.D. Ohio June 17, 2021) ("[I]t is not the amount of liquidated damages, per se, that controls the analysis . . . what matters is whether the specified liquidated damages in a given case rise to the level of serious harm considering all of the surrounding circumstances — such as the enforceability of the term, or the employee's pay rate, or other aspects of the arrangement.").

Moreover, multiple nurses — some working through the catastrophic COVID-19 pandemic — testified in their depositions that they were considerably overworked, that facilities were understaffed, and that the difficulties of their work caused near-daily emotional distress. Defendants offer no admissible contrary evidence on this point. In assessing TVPA liability, the Court would be remiss not to take such considerations into account. *See Paguirigan*, 2019 WL 4647648, at *18 (in finding that employment agency had violated TVPA § 1589(a)(2), considering, among other

factors, that "[t]hree of the nurses who were deposed complained of being overworked or that the nursing home was understaffed"). After all, "the relevant question" under § 1589(c)(2) is a "hybrid one." *Id.* at *16 (the inquiry may "consider the 'particular vulnerabilities of a person in the victim's position,' but [must also] find that 'her acquiescence be objectively reasonable under the circumstances'") (citing *Rivera,* 799 F.3d at 186-87).

Plaintiff Magtoles testified in her deposition that while at Meadowbrook Facility, although she had been oriented as an "entry level" registered nurse, she was given managerial responsibilities, noting "there was no written agreement between [Magtoles], United Staffing, or the Meadowbrook that [she] will do some managerial work" such as "doing the nursing care plans, [and] attending those managerial meetings." (Magtoles Dep. at 126-27.) Magtoles also stated that, as a result, although her "supposed[] work hours" were 7:00 a.m. to 3:00 p.m., most of the time she would end up working until 5:00 or 6:00 p.m., without being paid for hours that she worked beyond her shift schedule. (*See id.*) Although Magtoles spoke with Pascual regarding the issue "a few times," she was told "it's still in the adjusting period." (*Id.* at 127:23-128:03.) Magtoles further stated that she experienced emotional distress every time she went to work, including insomnia and anxiety. (*Id.* at 162, 186-87.) She ultimately resigned as a

result, and because she was working "more than the regular working hours. Some are unpaid." (*Id.* at 181:09-181:12.)

Plaintiff Ana Myrene Espinosa testified that at the Regal Heights facility, she "worked with 40 patients and with just two aides." (Ana Myrene Espinosa Dep. at 34:19-34:24.) She also testified that her role was "to be a charge nurse, treatment nurse, and med pass nurse all at the same time, which is impossible to take care of 40 patients," and that it was "overwhelming" and "we are overworked." (*Id.* at 34:25-35:05.) Espinosa also stated that after contracting COVID-19 a second time, United Staffing "said they are not going to pay me." "I had to ask them. I had to beg because I have been out from work for two weeks and I don't have any salary or anything." (*Id.* at 56:09-56:20.) Espinosa also stated: "I had those moments when I felt depressed, and it is like almost every day I feel the anxiety when I come to work, because I don't know if I'm going to have those patients and I believe I made Mr. Pasquale [sic] aware of that." (*Id.* at 70:20-70:24.)

In explaining her reasons for her resignation, Espinosa testified:

> **Q:** What were the reasons for your resignation?
>
> **A:** Like I said, we were overworked and it is giving me almost every day anxiety whenever I go to work. It's not safe for the patients. And I even question myself if I want to be a nurse because I cannot provide quality care for my patients. Taking care of 40 patients is

> impossible. That is why I resigned and I was
> hoping to get a better job.
>
> **Q:** Is it fair to say because of these issues
> you decided to resign?
>
> **A:** For me it is fair because it is affecting
> my mental health. I believe it is really
> important for my profession to be mentally
> stable. If you are not stable, how can you
> give quality care?

(*Id*. at 81:20-82:12.)

Finally, Section 1589(a) contains a scienter requirement ("[w]however knowingly provides or obtains the labor or services of a person . . .").  Defendants argue that the scienter requirement is not met here because, unlike in *Paguirigan*, "the record does not establish that either Defendant has sued any of the four Plaintiffs" and that there is "not even a suggestion that Defendants' standard employment contract has previously been found by any court to be unenforceable." (Defs. Mem. at 35.)  Defendants have not cited nor has the Court found any authority suggesting that the § 1589(a) scienter analysis turns on such specific grounds, nor does *Paguirigan* suggest that finding scienter requires such a particular finding.

The Court finds that there is sufficient and undisputed "evidence from which the jury could find that the employer intended to cause the victim to believe that she would suffer serious harm — *from the vantage point of the victim* — if she did not continue to work." *Paguirigan*, 2019 WL 4647648, at *19 (quoting *Muchira v.*

*Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017)) (emphasis added).
Scienter requires sufficient evidence to "find that the defendant
knew that the circumstance existed." *United States v. Calimlim*,
538 F.3d 706, 711 (7th Cir. 2008).

As described above, the Court has already found that the
liquidated damages provision constitutes a threat of sufficiently
serious harm.  There is neither evidence nor any serious argument
that Defendants, who were responsible for drafting and including
the liquidated damages provision in the first place, did not intend
for the nurses to believe they would, in fact, have to pay the
liquidated damages provision amount — in other words, *suffer
serious financial harm* — if the nurse left United Staffing's
employ.  The nurses' reliance on Pascual and Vinluan to explain
the contract terms, as discussed *supra*, also clearly demonstrates
that Defendants "knew that the circumstance existed," *see id.*, and
that Defendants "knowingly . . . obtain[ed] the labor or services"
of the nurses, with the understanding that the liquidated damages
provision "would effectively coerce nurses into continuing to
work." *See Paguirigan*, 2019 WL 4647648, at *19.

And effectively coerce it did.  Despite the extremely
fraught work circumstances and adverse impacts on her physical and
psychological health that Plaintiff Ana Myrene Espinosa testified
to, as described above (including but not limiting to having to

"beg" United Staffing to pay her the second time she contracted the COVID-19 virus), Espinosa kept working for Defendants.

> **Q:** Were you forced to work by United Staffing?
>
> **A:** I was not forced to work. I believe I have to fulfill my — *I have a contract, so I have to finish it. I don't have a choice.* Even if I feel anxiety going to work, I still have to go to work, even though they don't force us.

(Ana Myrene Espinosa Dep. at 71:07-71:14.) (emphasis added).

Such testimony evokes the circumstances that Congress intended to reach and remedy with the TVPA's broad definition of "harm" — instances "in which persons are held in a condition of servitude through nonviolent coercion." *See Javier v. Beck*, No. 13-CV-2926 (WHP), 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014).

The inclusion of the liquidated damages provision was no accident. From the "vantage point of the victim," the Court finds there is sufficient "evidence from which the jury could find that the employer intended to cause the victim to believe that she would suffer serious harm . . . if she did not continue to work," *Paguirigan*, 2019 WL 4647648, at *19 (citation omitted), especially when, as the Second Circuit directed in *Rivera*, considered with the "particular vulnerabilities" of the class members here. As discussed *supra*, such vulnerabilities include but are not limited to: Plaintiffs' emotionally and physically difficult work circumstances; reliance on Defendants' representatives to understand the contract; reluctance to complain to the United

States embassy about the contract due to being "nervous"; Plaintiffs' lack of negotiating or bargaining power as to the terms of the contract, in comparison to the highly experienced Defendants; and the non-compete clause in the contract, which placed unenforceable restrictions on Plaintiffs' ability to work in the nursing industry should they leave Defendants' employ.

Having found Defendants liable under § 1589(a)(2), the Court does not reach whether Defendants violated § 1589(a)(3) or § 1589(a)(4).

### B. 18 U.S.C. § 1589(b)

Having found United Staffing liable under § 1589(a)(2), the Court also finds that Defendant Santos is liable under TVPA § 1589(b), which provides:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection [1589](a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

§ 1589(b).

As discussed above, Defendant Santos is the sole owner, president, and CEO of United Staffing. Santos clearly and undeniably "played a role in this commercial enterprise, the purpose of which is to recruit Filipino nurses to the United States

to work at nursing homes affiliated with defendants," and thus, "knowingly benefit[ed] financially from labor obtained in violation of TVPA § 1589(a)." *See Paguirigan*, 2019 WL 4647648, at *19 (quotation marks omitted).  Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than 20 years.  (Pls. 56.1 at ¶ 10; Defs. Resp. 56.1 at ¶ 10.)  Furthermore, Santos acted with "'know[ledge] or in reckless disregard of the fact that the venture . . . engaged in the providing or obtaining of labor or services' through means prohibited by TVPA § 1589(a) — in this case, through the contracts' liquidated damages provisions."  *See Paguirigan*, 2019 WL 4647648, at *19.  As in *Paguirigan*, individual Defendant Santos "testified regarding [his] direct knowledge of the provision" and "signed the contract itself."  *Id.*; (*see, e.g.,* Santos Dep. at 90:07-90:17; United Staffing Dep. at 44:15-45:19.)  Thus, Santos had clear knowledge of the provision.

## VI.  Plaintiff Bhyng Espinosa's Claims of Fraud and Unjust Enrichment

Finally, Plaintiff Bhyng Espinosa seeks summary judgment on her claims for fraud and unjust enrichment.  (Pls. Mem. at 10.)

In relevant part, 20 C.F.R. § 656.12(b) provides that "[a]n employer must not seek or receive payment of any kind for any activity related to obtaining permanent labor certification, including payment of the employer's attorneys' fees, whether as an incentive or inducement to filing, or as a reimbursement for costs

incurred in preparing or filing a permanent labor certification application[.]" Plaintiff Bhyng Espinosa argues that, "[i]t is undisputed that, relying on the defendants' expertise in immigration matters, [Bhyng] Espinosa paid the defendants $7,532.00" for the "costs and attorneys' fees to obtain a labor certification used in connection with the employer's sponsorship of an individual for an employment-based visa," and that Defendants "should not be permitted to retain those funds." (Pls. Mem. at 10.)

In support, Plaintiff Bhyng Espinosa cites to Plaintiffs' Rule 56.1 Statement ¶ 30, where Plaintiff asserts, in relevant part, "Plaintiff Bhyng Espinosa paid United Staffing $7,532.00 to obtain a labor certification." (Pls. 56.1 ¶ 30.) Defendants, in turn, "object" to that assertion "to the extent that the alleged payments made as purportedly evidenced by Exhibit '9' do not indicate payments were made to 'United Staffing' 'to obtain a labor certification.'" (Defs. Resp. 56.1 at ¶ 30.)

Upon review of "Exhibit 9" and other submitted evidence, the Court denies summary judgment as to Plaintiff Bhyng Espinosa's fraud and unjust enrichment claims. (*See generally* ECF No. 43-11.) Although the receipts allegedly relate to Ms. Bhyng Espinosa's payments for her "lawyer's and newspaper ad fees" (*id.* at 3), "her application" (*id.* at 4), "1/2 of [illegible] — motion to reopen/L.C." (*id.* at 5), and "her balance for the legal fees,"

(*id.* at 6), none of these receipts clearly reference a labor certification.  As such, there is a genuine dispute of material fact as to the purpose of Plaintiff Bhyng Espinosa's payments to Defendants and summary judgment is not appropriate.

## CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.  Plaintiffs' requested declaratory and injunctive relief is GRANTED.  The Clerk of Court is directed to enter judgment declaring the liquidated damages provision and non-compete clauses in all plaintiffs' contracts to be unenforceable and to enter an injunction permanently enjoining Defendants from attempting or threatening to enforce either.

2.  Plaintiffs' summary judgment motion as to liability on the breach of contract claim is:

    a. GRANTED on the following grounds:

        i.   failure to pay Plaintiffs for all hours worked;

        ii.  failure to pay Plaintiffs the prevailing wage during Regal Heights Orientation.

    b. DENIED on the following grounds:

        i.   deduction of time for meal periods or breaks that were not taken.

        ii.  failure to give Plaintiffs 2,000 hours of work per year.

       c. GRANTED as to piercing the corporate veil of Defendant United Staffing to hold Defendant Santos individually liable for breach of contract.

       d. Damages to Plaintiff Magtoles and the class caused by Defendants' breach of contract are to be determined at a later date.

3. Plaintiffs' summary judgment motion as to Defendants' liability under the TVPA is GRANTED. Damages to Plaintiff Magtoles and the class under the TVPA are to be determined at a later date.

4. Plaintiff Bhyng Espinosa's summary judgment motion for fraud and unjust enrichment claims against Defendants is DENIED.

5. The class is also entitled to reasonable attorneys' fees, which are to be determined at a later date.

6. No later than one week after the date of this Memorandum and Order, the parties shall contact Magistrate Judge Peggy Kuo to schedule a settlement conference. Further, the parties are strongly encouraged to consent to Magistrate Judge Kuo's jurisdiction in this case.

7. If the parties do not resolve or settle this case, they shall: (a) file a joint status report to the Court within two business days to advise of their failure to settle, and to schedule a status conference to address: how

damages are to be determined; Defendants' counterclaim for breach of contract as to Plaintiffs Magtoles, Tan, and Ana Myrene Espinosa; and Plaintiff Bhyng Espinosa's claims for unjust enrichment and fraud, and (b) promptly meet and confer on these issues and present a joint plan to the Court.

**SO ORDERED.**

_____
Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York

Dated:       March 30, 2023
            Brooklyn, New York